# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|                                         |     |                                |
|-----------------------------------------|-----|--------------------------------|
| IN RE:                                  | §   |                                |
| WILLIAM R. CANADA, JR.,                 | §   |                                |
|                                         | §   |                                |
|   Debtor,                     | §   |                                |
|                                         | §   |                                |
| --------------------------------------- | §   |                                |
|                                         | §   |                                |
| UNITED STATES OF AMERICA (IRS),         | §   |                                |
|                                         | §   |                                |
|   Appellant,                  | §   |                                |
|                                         | §   |                                |
| v.                                      | §   | CIVIL ACTION NO. 3:16-CV-2000-B |
|                                         | §   |                                |
| WILLIAM R. CANADA, JR.,                 | §   |                                |
|                                         | §   |                                |
|   Appellee.                   | §   |                                |

## MEMORANDUM OPINION AND ORDER

Appellant United States of America (IRS) appeals a final order of the bankruptcy court sustaining Debtor/Appellee William R. Canada, Jr.'s objection to the IRS's claim for civil penalties. In this case, the IRS attempts to impose a $40,346,167.87 civil penalty on Canada's bankruptcy estate for his failure to register as tax shelters certain financial arrangements he marketed and sold from 1998 to 2001 as an employee of the Heritage Organization, LLC. The bankruptcy court held that the arrangements were not "tax shelters" under the applicable statute, and thus Canada could not be penalized for failing to register them. Alternatively, the bankruptcy court found that even if the arrangements were "tax shelters," Canada fell within a statutory safe harbor provision because he had "reasonable cause" for the failure to register. For the reasons explained below, the ruling of

the bankruptcy court is **AFFIRMED**.

# I.

# BACKGROUND

A.   *Factual History*[1]

After graduating from Harvard law school in 1979, Appellee William R. Canada, Jr. worked for a variety of law firms, primarily as a commercial litigator. Bankr. Op. 4.[2] Dissatisfied with the practice of law, Canada went to work for the Heritage Organization in 1995 to "try something different." *Id.* at 4–5. Canada admits he had "very little" tax experience before going to work for the Heritage Organization. *Id.* at 4. The Heritage Organization specialized in insurance-based estate planning strategies for high net worth individuals. R. 175. According to Canada, employees called "initiators" would "work the phones" to locate high net worth individuals, after which "contractors"—such as Canada—would schedule face-to-face meetings with prospective clients to interest them in Heritage's estate planning services. R. 174. Finally, principals of the Heritage Organization would make targeted presentations to specific individuals who showed interest in Heritage's services. *Id.*

Canada was employed at Heritage from 1995 to 2002. Doc. 8, Canada Resp. Br. 6. Despite holding the position of President from approximately 1995 to 2002 and Chief Operating Officer from approximately 1995 to 2000, Canada contends that Heritage's main principal, Gary Kornman, was

---

[1]This factual history is drawn from the undisputed facts in the parties' briefing and the bankruptcy record on appeal. Any disputed fact is noted as the contention of a particular party.

[2]For ease of reference, the Court cites to the bankruptcy court's opinion, found in the record (Docs. 3, 6) at R. 7–43, as simply "Bankr. Op."

always truly in control of the organization and that Canada had none of the duties traditionally associated with the title of President or Chief Operating Officer. Bankr. Op. 5–6; Doc. 8, Canada Resp. Br. 8. According to Canada, he was hired simply to "learn the business of Heritage and ultimately be able to make presentations to clients." R. 174. He describes his position in the organization as a "pure salesman." *Id.*

In 1998, an attorney named Ed Ahrens brought a new strategy to the attention of the Heritage Organization. R. 175–76. The new strategy (the Heritage Transactions) was designed to reduce capital gains taxes for Heritage's clients by short-selling Treasury securities. Bankr. Op. 7–8. As described in its simplest form by Canada, the client would form a pass-through entity, such as an LLC or an S-Corporation. R. 176. Next, the client would open an individual brokerage account with a major brokerage firm, short-sell Treasury securities through the brokerage account, and reinvest the short-sale proceeds in reverse repurchase agreements. *Id.* Then the client would contribute the brokerage account, including the obligation to repurchase the Treasury securities arising from the reverse repurchase agreements, to the pass-through entity. *Id.* The client, by ignoring the obligation to repurchase the Treasury securities—which lawyers were willing to opine was legal at the time based on the tax laws—was able to create "basis" in the pass-through entity equal to the amount of the proceeds of the Treasury short. R. 176–77. Though the actual implementation varied from client to client, the essence of the strategy was that a complicated series of financial transactions involving Treasury short-sales could be used to manipulate an asset's "basis" and manufacture artificial losses on paper, which could then be applied against large capital gains to reduce capital gains taxes in a given year. It is undisputed that neither Heritage nor Canada ever bought or sold any of the assets

or securities to, from, or for the Heritage clients to effectuate the Heritage Transactions; what Heritage and Canada sold was the strategy itself. This distinction is very important to the Court's analysis below.

From 1998 to 2002, Heritage successfully marketed the Heritage Transactions to several clients.[3] The Heritage Transactions were marketed in a similar manner to that described above: "initiators" would make phone calls and try to set up initial meetings, "contractors" would follow up with face-to-face meetings, and at some point individualized presentations and materials would be created for interested clients. R. 199–202. Before Heritage would reveal the specifics of the strategy, however, the client had to sign an engagement contract. *See, e.g.*, R. 1026–33. Although the contracts varied slightly for each client, they generally provided that, after receiving the necessary information regarding the client's financial affairs, Heritage "may communicate to [the client] one or more Strategies which, singularly or in combination, may produce one or more of the following results," which usually amounted to "reducing capital gains tax liabilities." R. 1026. The contracts defined "strategies" as follows:

> The term "Strategies" shall be broadly construed and shall mean the contracts, Persons identified, facts, data, knowledge, documentation, opinions, concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures divulged, described, communicated, detailed, arranged or identified by [Heritage], and all variations, modifications, sequences, rearrangements and recombinations thereof.

R. 1030. The contracts also acknowledged that "the Strategies are not necessarily composed of information which is proprietary, trade secrets or exclusively known to [Heritage] and that the

---

[3] The specific arrangements for which the IRS seeks to penalize Canada occurred between 1998 and 2001. Doc. 7, IRS Br. 8.

usefulness and value of the Strategies may be attributable to the timing, sequencing and combinations of the various non-proprietary components of the Strategies and/or to the fact that the Strategies may not be known to the [clients] even though they may be known to others." R. 1027.

In the event that a client implemented "in whole or in part, any one or more of the Strategies" in the ten years following disclosure of the strategy by Heritage to the client, the client would pay Heritage 25% of the taxes avoided by implementing the strategy. R. 1026. If a client signed the engagement agreement but did not implement any of the strategies, the client would not owe Heritage any fees other than a $22,500 up front fee for Heritage's employees' "travel expenses" in presenting the strategy. R. 1026.

The contracts also imposed a stiff penalty for unauthorized disclosures of the strategy by a Heritage client. After signing the engagement contract, if a client did not "maintain the absolute secrecy and confidentiality of the Strategies," the client would be assessed a "fee" of "Two Million Dollars ($2,000,000) for each Person to whom the Strategies are Revealed." R. 1027. Additionally, if a person to whom the unauthorized disclosure was made implemented any of the strategies, the client would be assessed an additional "fee" of "six percent (6%) of the Value of all Property used to Implement any of the Strategies." *Id.*

According to the IRS, the total fees collected by Heritage for Heritage Transactions in which Canada participated between 1998 and 2001 was $62,914,237. Doc. 7, IRS Br. 10 (citing R. 659). It appears Canada may have been involved in as many as 12 different Heritage Transactions for different clients. *See* R. 659 (listing 12 Heritage Transactions on the document from which it appears the IRS calculates total fees to Heritage of $62,914,237 during the period). In the bankruptcy court,

Canada indicated that "Heritage never did more than a few deals a year of any type." R. 199. It is undisputed that the Heritage Transactions were never registered with the IRS as tax shelters by Canada or anyone else.

Following a dispute over his compensation, Canada left the Heritage Organization in 2002. Bankr. Op. 10. In April 2004, Canada won an arbitration award for more than $6 million against Heritage. *Id.* A month later, in May 2004, Heritage filed for Chapter 11 bankruptcy, in which Canada participated as a creditor. *Id.* The bankruptcy court confirmed Heritage's Chapter 11 reorganization plan in September 2007. *Id.* Sometime in late 2006, however, the IRS apparently began investigating Canada for his involvement with the Heritage Transactions. R. 891–904. Canada was first contacted by the IRS in February 2007 regarding the Heritage Transactions. R. 923. A second letter, dated April 3, 2007, notified him that he was being investigated for tax shelter promoter penalties under 26 U.S.C. § 6707. R. 924. Though it is unclear from the record what progress was made on the investigation or whether the IRS communicated with Canada at all during the interim, in a letter dated April 9, 2015—almost a decade after the investigation began—the IRS notified Canada of its intention to impose $49,108,452 in civil penalties for his "failure to register a tax shelter as required by IRC § 6111 and the associated regulations." R. 646.

B.    *Procedural History*

As a result of the IRS's notice of its intention to impose this penalty, Canada filed for Chapter 11 bankruptcy on September 15, 2015. Bankr. Op. 10–11. In the bankruptcy court, the IRS submitted its original proof of claim on October 14, 2015, for $40,286,499 (R. 131–33), to which Canada objected on various grounds (R. 121–30). The IRS filed an amended proof of claim on

January 12, 2016, for $40,346,167.87 (R. 456–59), to which Canada again objected on multiple grounds (R. 141–48). In the bankruptcy court, Canada moved for summary judgment on his objection to the IRS's proof claim on two grounds: (1) statute of limitations, and (2) preclusion. R. 1732–63. After full summary judgment briefing and a hearing, the bankruptcy court orally denied Canada's motion for summary judgment. R. 47.

Ultimately, after pre-trial briefing, a two-day trial, and another round of post-trial briefing, the bankruptcy court sustained Canada's objection and disallowed the IRS's claim for civil penalties. R. 7–43. Although Canada had raised multiple grounds in his objection, the bankruptcy court found dispositive the argument that the Heritage Transactions did not fit within the applicable statutory definition of a "tax shelter" because they were not "investments." Bankr. Op. 4. The court went a step further and held, alternatively, that even if the Heritage Transactions *were* "tax shelters," then Canada had established "reasonable cause" for not registering them. *Id.* Therefore, the bankruptcy court did not reach any of the additional grounds advanced by Canada in his objection to the IRS's claim. *Id.* at 4 n.12. A final order consistent with the bankruptcy court's decision was entered on June 17, 2016. R. 4–6.

The IRS timely filed its Notice of Appeal of the bankruptcy court's decision on July 8, 2016. Doc. 1; R. 1. "As a precautionary matter to preserve and protect all of his objections," Canada later filed a provisional cross-appeal based on the bankruptcy court's denial of his motion for summary judgment, "as well as the multiple grounds not reached or decided by the [bankruptcy] Court in its" final order disallowing the IRS's claim. R. 44–46.[4] Canada makes clear that his cross-appeal is "to be

---

[4]Because Canada cross-appealed two separate orders of the bankruptcy court—(1) the order denying his motion for summary judgment, and (2) the order sustaining his objection and disallowing the IRS's

considered only in the event that the reviewing court determines that the [bankruptcy court's decision sustaining his objection] should be vacated or reversed in whole or in part for any reason or cannot be affirmed based on the grounds and reasoning relied upon [sic] the Court below." R. 44.

The IRS filed its appeal brief in this Court on September 23, 2016. Doc. 7, IRS Br. Canada filed a combined response and cross-appeal brief on October 24, 2016. Doc. 8, Canada Resp.[5] The IRS then filed its reply/cross-appeal response brief on November 22, 2016 (Doc. 10, IRS Reply), and Canada filed a combined sur-reply/cross-appeal reply brief on December 6, 2016 (Doc. 12, Canada Sur-Reply). On the same day, Canada filed a motion to strike a portion of the IRS's reply brief. Doc. 11, Mot. to Strike. The IRS responded (Doc. 13, IRS Resp. to Mot. to Strike), and Canada replied (Doc. 15, Canada Reply to IRS Resp. to Mot. to Strike). Both the IRS's appeal and Canada's Motion to Strike are ripe for review.

## II.

## LEGAL STANDARDS

A.   *District Court Review of Bankruptcy Court Order*

Final judgments, orders, and decrees of a bankruptcy court may be appealed to a federal district court. 28 U.S.C. § 158(a). Because the district court functions as an appellate court in this scenario, it applies the same standards of review that federal appellate courts use when reviewing district court decisions. *Webb v. Reserve Life Ins. Co.*, 954 F.2d 1102, 1103–04 (5th Cir. 1992). Thus,

---

claim—his notice of cross-appeal was later split into two separate notices of cross-appeal. *See* R. 51–54, Am. Notice of Cross-Appeal and R. 55–100, 2d Am. Notice of Cross-Appeal.

[5]Canada's brief in response to the IRS's appellate brief also serves as his initial cross-appeal brief. For ease of reference, however, the Court will cite to this document simply as Canada's Response and to the attendant filings as the IRS's Reply and Canada's Sur-Reply.

a district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law or mixed questions of law and fact *de novo*. *McLain v. Newhouse*, 516 F.3d 301, 307 (5th Cir. 2008); *Wooley v. Faulkner*, 542 F.3d 131, 135 (5th Cir. 2008). A factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc.*, 783 F.2d 1283, 1287 (5th Cir. 1986) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). It is insufficient that the reviewing court, upon examining the evidence, would merely have decided differently if sitting as the trier of fact. *Id.* (quoting *Anderson*, 470 U.S. at 573). In conducting a "clear error" review, the court must give due regard to the opportunity of the bankruptcy judge to determine the credibility of the witnesses. *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003). *De novo* review of the bankruptcy court's conclusions of law, on the other hand, "requires this court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis or conclusions." *In re Lawler*, 106 B.R. 943, 952 (N.D. Tex. 1989) (citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1210 (7th Cir. 1984)).

B.      *Proof of Claim in Bankruptcy*

The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim. *In re Margaux City Lights Partners, Ltd.*, No. 12-35828-BJH, 2014 WL 6668982, at *3 (Bankr. N.D. Tex. Nov. 20, 2014). A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). "[T]he burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered

by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Id.* (quoting *In re Rally Partners, L.P.*, 306 B.R. 165, 168–69 (Bankr. E.D. Tex. 2003)).

An objecting party may meet this burden by producing specific and detailed allegations that place the claim into dispute, by presenting legal arguments based on the contents of the claim and its supporting documents, or by presenting pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question. *Id.* (quoting *In re Rally Partners*, 306 B.R. at 168–69). If the objecting party comes forth with such evidence rebutting the claim, then the claimant must produce additional evidence to prove the validity of the claim by a preponderance of the evidence. *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988); *see also* 26 U.S.C. 7491(c) ("Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.").

In this case, the IRS, therefore, has the ultimate burden to establish by a preponderance of the evidence Canada's liability for civil penalties under 26 U.S.C. § 6707. Canada, on the other hand, bears the burden of proving his reasonable cause defense, which he must also establish by a preponderance of the evidence. *Brinkley v. Comm'r of Internal Revenue*, 808 F.3d 657, 668–69 (5th Cir. 2015).

# III.

# ANALYSIS

This bankruptcy appeal essentially turns on two questions which the IRS avers the bankruptcy court answered incorrectly: (1) whether the Heritage Transactions were "investments" constituting "tax shelters" within the meaning of 26 U.S.C. § 6111, for which registration would have been required; and (2) if so, whether Canada established "reasonable cause" under 26 U.S.C. § 6707 for failing to register them. Doc. 7, IRS Br. 2–3.[6] Regarding the first issue, the bankruptcy court, noting an almost total lack of authority interpreting the applicable versions of 26 U.S.C. §§ 6111 and 6707, applied various canons of statutory construction, as well as a plain meaning analysis, to find that the Heritage Transactions were not "tax shelters" because they were not "investments" within the meaning of 26 U.S.C. § 6111. Bankr. Op. 13–26. Going a step further, the bankruptcy court found that even if the Heritage Transactions were "investments" under § 6111, Canada had "reasonable cause" for failing to register them, which is a defense to liability under § 6707. *Id.* at 28–37. In reaching this conclusion, the bankruptcy court considered caselaw interpreting a similar "reasonable cause" provision in the tax code, the authority interpreting § 6111 available at the time, the lack of an obvious way to fit the Heritage Transactions into the statutory framework, and Canada's testimony that he had analyzed the statute and implementing regulation

---

[6]In its brief, the IRS actually states four issues on appeal. Doc. 7, IRS Br. 2–3. The IRS acknowledges, however, that one of the four—whether the bankruptcy court erred in sustaining Canada's objection and disallowing the IRS's claim—is really the "ultimate issue presented in the case" and "turns on one or more of the secondary issues set out below." *Id.* at 2. And another—whether the bankruptcy court erred by failing to give *Chevron* deference to a temporary Treasury regulation—is subsumed by the question of whether the Heritage Transactions were "investments" and will be addressed as such. So as a practical matter, the analysis breaks down into two issues.

himself and determined that they did not apply—testimony which the bankruptcy court found "to be both plausible and credible." *Id.* at 35. The Court begins with the question of whether the Heritage Transactions were "investments" constituting "tax shelters" for which registration was required.

A.    *Whether the Heritage Transactions Were "Investments" Under 26 U.S.C. § 6111*

As the parties acknowledge, the underlying facts in this bankruptcy appeal are largely undisputed. *See* Doc. 7, IRS Br. 4 ("The facts material to [this appeal] are not in dispute as Canada offered the only testimony on the Heritage transactions, he entered into a stipulation regarding his 'reasonable cause' defense, and the exhibits were admitted without objection."); Doc. 8, Canada Resp. 13 ("The Court must construe and apply the two relevant tax statutes to virtually undisputed facts."). The parties generally agree on the details of the Heritage Transactions, how they worked, and Canada's involvement with them. The threshold issue is whether the Heritage Transactions fell within the statutory definition of a tax shelter under the version of 26 U.S.C. § 6111 in effect at the time. As both sides acknowledge, this is a matter of statutory interpretation, which this Court reviews *de novo.* Doc. 7, IRS Br. 2–3; Doc. 8, Canada Resp. 1; *In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 668 (5th Cir. 2009).

At the start, there is no question that the Heritage Transactions were "tax shelters" in a colloquial sense, in that the whole point was to shield income from capital gains taxes. Canada admits as much. Doc. 8, Canada Resp. 9, 13 n.8. There is also no dispute that the tax benefits from these and similar types of transactions have since been disallowed by the IRS. *Id.* at 9; Bankr. Op. 36. Indeed, the IRS has apparently collected all of the taxes avoided by the Heritage Transactions

from the individual Heritage clients themselves. Bankr. Op. 36. The precise issue before the Court, however, is not whether the Heritage Transactions fit some general concept of a tax shelter or even whether they were "legal" or "illegal." Rather, the issue the Court must decide is whether they were correctly classified as "tax shelters" within the language of a specific statute and thus required to be "registered" as such, for which such failure to register would subject Canada to civil penalties.

To begin, the IRS's claim for civil penalties is actually a function of two different tax provisions: 26 U.S.C. §§ 6707 and 6111. Before delving into the statutory language, however, the Court notes that both provisions were amended in October 2004, two years after Canada left Heritage.[7] As the conduct for which the IRS now seeks to impose civil penalties occurred between 1998 and 2001 (Doc. 7, IRS Br. 8), the parties agree that the applicable versions of the statutes are those in effect from August 5, 1997, through October 22, 2004. Doc. 7, IRS Br. 2; Doc. 8, Canada Resp. 14 n.10. Therefore, unless otherwise indicated, any references in this opinion to either statute are to those versions.

Section 6111, titled "Registration of tax shelters," encompasses the actual registration requirement. 26 U.S.C. § 6111. It requires "[a]ny tax shelter organizer [to] register the tax shelter with the Secretary (in such form and in such manner as the Secretary may prescribe) not later than the day on which the first offering for sale of interests in such tax shelter occurs." *Id.* § 6111(a)(1). This naturally begs the questions: (1) What is a tax shelter? and (2) Who is a tax shelter organizer?[8]

---

[7]Though it makes no difference in this case, § 6707 was actually amended a second time on December 21, 2005. *See* 26 U.S.C. § 6707 (amended 2005).

[8]The form, manner, and timing of registration requirement are of little concern to the Court as the parties concede that, whatever was required, the Heritage Transactions were never registered by anyone.

It stands to reason that the answer to the latter necessarily depends on the answer to the former—that is, to be a "tax shelter organizer" one must first be dealing with a "tax shelter."[9]

The general definition of a tax shelter is found in § 6111(c), which provides as follows:

(c) Tax shelter.--For purposes of this section--

(1) In general.--The term "tax shelter" means any investment--

(A) with respect to which any person could reasonably infer from the representations made, or to be made, in connection with the offering for sale of interests in the investment that the tax shelter ratio for any investor as of the close of any of the first 5 years ending after the date on which such investment is offered for sale may be greater than 2 to 1, and

(B) which is--

(i) required to be registered under a Federal or State law regulating securities,

(ii) sold pursuant to an exemption from registration requiring the filing of a notice with a Federal or State agency regulating the offering or sale of securities, or

(iii) a substantial investment.

*Id.* § 6111(c)(1).

Alternatively, § 6111(d) describes "Certain confidential arrangements treated as tax

_____

[9]The statute defines a "tax shelter organizer" as a "person principally responsible for organizing a tax shelter." 26 U.S.C. § 6111(e)(1)(A). Or if that person fails to fulfill the registration requirement, then it may be "any person who participated in the organization of the tax shelter." *Id.* § 6111(e)(1)(B). And if that person fails to register a tax shelter, then it may be "any person participating in the sale or management of the investment at a time when the tax shelter was not registered." *Id.* § 6111(e)(1)(C). The bankruptcy court found, and fortunately for this Court neither side has challenged the finding, that if the Heritage Transactions were in fact "investments" constituting "tax shelters" under § 6111, then Canada was certainly a "tax shelter organizer" based on his involvement with the Heritage Transactions. Bankr. Op. 26–28. The parties hotly dispute, of course, whether the Heritage Transactions were "investments" constituting "tax shelters."

shelters":

> (1) In general.--For purposes of this section, the term "tax shelter" includes any entity, plan, arrangement, or transaction--

>> (A) a significant purpose of the structure of which is the avoidance or evasion of Federal income tax for a direct or indirect participant which is a corporation,

>> (B) which is offered to any potential participant under conditions of confidentiality, and

>> (C) for which the tax shelter promoters may receive fees in excess of $100,000 in the aggregate.

*Id.* § 6111(d)(1).[10]

Section 6111 goes on to define several terms used in both §§ 6111(c) and (d), including "Tax shelter ratio" (§ 6111(c)(2)), "Investment base" (§ 6111(c)(3)), "Substantial investment" (§ 6111(c)(4)), and "Conditions of confidentiality" (§ 6111(d)(2)). As will be seen below, however, the Court need look no further than the first sentence of § 6111(c)(1) to answer the question of whether the Heritage Transactions were "tax shelters" under the statute: "The term 'tax shelter' means any *investment* . . . ." *Id.* § 6111(c)(1) (emphasis added). Before getting there, however, the Court must mention the other statute at issue: 26 U.S.C. § 6707.

While § 6111 establishes the registration requirement for tax shelters, § 6707 establishes the

---

[10]Although § 6111(d) factors into the IRS's statutory interpretation argument by way of comparison with § 6111(c)—as will be discussed below—the IRS does not argue, nor could it, that the Heritage Transactions fall under the alternative definition of "confidential arrangements treated as tax shelters" in § 6111(d). The reason is because § 6111(d) clearly only applies to an "entity, plan, arrangement, or transaction . . . a significant purpose of the structure of which is the avoidance or evasion of Federal income tax for a direct or indirect participant which is a *corporation* . . . ." 26 U.S.C. § 6111(d)(1) (emphasis added). Here, the Heritage clients were all individuals. Therefore, if the Heritage Transactions were "tax shelters" at all, it could only be under the § 6111(c) definition.

penalty for failing to so register. Section 6707 provides the following:

> (a) Failure to register a tax shelter.--
>
> > (1) Imposition of penalty.--If a person who is required to register a tax shelter under section 6111(a)--
> >
> > > (A) fails to register such tax shelter on or before the date described in section 6111(a)(1), or
> > >
> > > (B) files false or incomplete information with the Secretary with respect to such registration,
> >
> > such person shall pay a penalty with respect to such registration in the amount determined under paragraph (2) or (3), as the case may be. No penalty shall be imposed under the preceding sentence with respect to any failure which is due to reasonable cause.

*Id.* § 6707(a).

Having laid out the statutory scheme, the Court now turns to the analysis of whether the Heritage Transactions fit within this framework. As the bankruptcy court noted, there are only a handful of cases throughout the country that even mention the pre-2004 versions of §§ 6707 or 6111, and none that thoroughly analyze § 6111's definition of a "tax shelter" or an "investment."[11]

---

[11]In its Reply Brief, the IRS points to a recent case out of the Federal Circuit which it argues supports its position that tax avoidance "strategies," such as those at issue in this case, are "investments" constituting "tax shelters" within the meaning of the applicable version of § 6111(c). Doc. 10, IRS Reply 4–12 (citing *Diversified Grp. Inc. v. United States*, 841 F.3d 975 (Fed. Cir. 2016)). Admittedly, the transactions in *Diversified* appear similar to those in this case, and some language in that decision appears to implicitly find that those "plan[s]" or "strateg[ies]" were "tax shelters." But the precise issue before the court in that case was not whether or not the "plans" or "strategies" were "tax shelters" or "investments" under § 6111. Instead, the court in *Diversified* was concerned with the divisibility of a § 6707 penalty for purposes of the IRS's "full payment rule," which is a jurisdictional prerequisite to a taxpayer's suit for a penalty refund. In that case, the taxpayer, assuming a § 6707 penalty was divisible on a transaction-by-transaction basis, paid the penalty equivalent to only a single transaction within the penalized tax shelter and then filed suit for a refund. *Diversified*, 841 F.3d at 978–79. Finding that a § 6707 penalty is *not* divisible on a transaction-by-transaction basis, the Federal Circuit held that a taxpayer must pay the entire penalty before bringing suit for a refund. *Id.* at 980. Though the language of *Diversified* would seem to assume that the arrangements at issue were, indeed, tax shelters, that question was not squarely before the court. And, therefore, the Court is not

Therefore, the Court will proceed, as did the bankruptcy court, to interpret the statute's meaning using the traditional principles of statutory construction.

"As in any statutory construction case, '[w]e start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'" *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). Here, § 6111 includes an explicit definition of "tax shelter." It begins "For purposes of this section . . . [t]he term 'tax shelter' means any investment . . . ." 26 U.S.C. § 6111(c). Therefore, for the Heritage Transactions to fit within § 6111's definition of "tax shelter," they must first be "investments."

"Investment" is not a defined term in the statute. Therefore, the Court must look to the term's "ordinary meaning." *Sebelius*, 133 S. Ct. at 1893. Upon first glance, the Heritage Transactions simply do not appear to fit within any commonly understood definition of the word "investment." Heritage did not offer for sale to, or purchase on behalf of, its clients any share or interest in any corporation, entity, or stock in the traditional sense. What it sold was a strategy, composed of a series of prescribed steps or transactions, to reduce capital gains taxes. Though it is not totally clear from the record to what extent Heritage oversaw or facilitated the transactions, it is clear that the purchase and sale of Treasury securities were accomplished through independent, national brokerage

---

persuaded by the IRS's reliance on *Diversified* for the interpretation of § 6111.

houses. All that clients purchased from Heritage was the idea.[12]

The bankruptcy court came to the same conclusion relying on the *Black's Law Dictionary* definition of "investment." Bankr. Op. 20. *Black's* actually includes two definitions for "investment": (1) "[a]n expenditure to acquire property or assets to produce revenue; a capital outlay"; and (2) "[t]he asset acquired or the sum invested." *Investment*, Black's Law Dictionary (10th ed. 2014). Again, neither definition squarely fits the Heritage Transactions; the Transactions were not "expenditures," "assets," "property," or "sums invested."

On appeal, the IRS argues that the bankruptcy court ignored "alternative aspects of the very definition on which it relies." Doc. 7, IRS Br. 12. For instance, the IRS contends that "[f]unding a brokerage account to purchase securities is perhaps the most basic and widely recognized way to 'invest,' as even the most unsophisticated investor knows." *Id.* at 13. It goes on to argue that the "short sales proceeds and the promised tax attributes are 'assets acquired' under *Black's* definition of 'investment'" and that "both the cash proceeds and the reverse re-purchase agreements are 'expenditures to acquire assets to produce revenue.'" *Id.* at 13–14.

To be sure, the implementation of the Heritage Transactions through the funding of brokerage accounts, the purchase of treasury securities, and setting up entities certainly *involved* "investments" of various types. What the IRS seems to miss, however, is that the Heritage Transactions were not *themselves* "investments." Belying its own argument, the IRS notes that

---

[12]To be exact, according to the specific language in the engagement agreements, all the clients truly purchased was the opportunity to hear the idea—not even the idea itself. *See, e.g.*, R. 1026 ("[Heritage], after receiving the necessary data and objectives regarding the financial situation and potential tax liabilities of the [client] and after meeting with the [client] to discuss their objectives, *may communicate to the [client]* one or more Strategies which, singularly or in combination, may produce one or more of the following results . . . .") (emphasis added).

"[Heritage was] selling a complicated proprietary transaction." *Id.* at 16.[13] This transaction certainly

contemplated the use of "investments" to implement the Heritage strategy, but the Heritage

Transaction itself was simply that: a strategy. Heritage did not sell the client the Treasury securities

or the business entities to implement the strategy; it merely gave the client the idea. As the

bankruptcy court analogized, offering to advise someone which tech stocks are booming is not the

same as selling them shares of Google. Bankr. Op. 21.

The IRS also takes issue with the bankruptcy court's comparison of the language of

§§ 6111(c) and (d). As noted above, § 6111(d), which applies to corporate taxpayers, explicitly

encompasses an "entity, plan, arrangement, or transaction." 26 U.S.C. § 6111(d)(1). It does not,

however, use the term "investment." *See id.* Section 6111(c), on the other hand, in defining a "tax

shelter" for general purposes, makes no mention of "entities," "plans," "arrangements," or

"transactions." *See id.* § 6111(c). Normally, when the legislature uses certain language in one part

of a statute and different language in another, courts may assume that different meanings were

intended. *Milner v. Dep't of the Navy*, 562 U.S. 562, 583–84 (2011) (citing *Sosa v. Alvarez-Machain*,

542 U.S. 692, 711 n.9 (2004)). The IRS argues, however, that common sense and the legislative

history of § 6111 demonstrate "that the difference in language in the two subsections does not have

the import that the [bankruptcy] court ascribed to it." Doc. 7, IRS Br. 18, 23.

The IRS first contends that drawing a distinction between an "investment" and a "plan,

---

[13]Elsewhere in its Brief, the IRS makes similar acknowledgments. *See, e.g.*, Doc. 7, IRS Br. 20 ("There can be no doubt that the Heritage Transactions involved, at the very least, a plan or arrangement, as the Heritage contracts make clear . . . ."); *id.* at 20–21 ("In short, Canada, through Heritage, was selling . . . an expansive process . . . which, at a minimum, provided a detailed pathway to participate in the transaction under Heritage's oversight.")

arrangement, or transaction" "defies common sense" because "every investment is—necessarily—a transaction." *Id.* at 17–18. This Court does not disagree that in a general sense every "investment" probably involves some sort of "transaction" to effectuate it. But the issue in this case is not whether an "investment" was a "transaction" in a general sense, but rather whether the Heritage Transactions were "investments" within the meaning of § 6111. Notably, the IRS does not, nor could it, make the inverse argument—that every "transaction" is necessarily an "investment"—which would be more helpful to its position.

As additional support for its argument that the difference between the two sections was not intentional, the IRS points to the legislative history of § 6111(d). Before considering the particular portions of the legislative history identified by the IRS, it is important to define the role allocated to legislative history in statutory construction. "Legislative history is relegated to a secondary source behind the language of the statute in determining congressional intent" and "even in its secondary role must be used 'cautiously.'" *Boureslan v. Aramco*, 857 F.2d 1014, 1018 (5th Cir. 1988) (citing *United States v. Smith*, 795 F.2d 841, 845–46 (9th Cir. 1986)). "The Supreme Court has repeatedly stated that '[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive.'" *Id.* (quoting *Escondido Mut. Water Co. v. La Jolla Indians*, 466 U.S. 765, 772 (1984)).

As the IRS notes, § 6111(d) was not part of the original package of Deficit Reduction Act legislation enacted in 1984. *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 141, 98 Stat. 494, 677–81. Instead, § 6111(d) was added in 1997. *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1028, 111 Stat. 788, 926–28. Thus, from 1984 to 1997, § 6111(c) was the only definition of a "tax shelter" in the statute. A House Report from the time of the addition of § 6111(d) states

that "[a] corporate tax shelter is any investment, plan, arrangement or transaction . . . ." H.R. Rep. No. 105-148, at 470 (1997), *reprinted in* 1997 U.S.C.C.A.N. 678. Though the IRS acknowledges that neither the text of the original bill nor the enacted version of § 6111(d) included the word "investment," it argues that this House Report "shows that there was no significance to the differing phrases in 6111(c) and 6111(d) and that they were considered to refer to the same thing." Doc. 7, IRS Br. 18. "At the very least," the IRS goes on, "the legislative history shows that Congress did not *intentionally* distinguish 'investment' from 'plan, arrangement, or transaction' . . . ." *Id.* (emphasis in original). The Court, however, is not convinced. Sections 6111(c) and (d) were enacted at different times and for different purposes. Unsurprisingly, they employ different language. The Court sees no reason to ignore the accepted canon of construction which counsels that the difference in language was intentional. If anything, the IRS's argument suggests that the word "investment" perhaps should have been included in § 6111(d), not that § 6111(d)'s "entity, plan, arrangement, or transaction" language, added in 1997, should be read into § 6111(c)'s use of the term "investment."

The IRS's arguments regarding the legislative history § 6111(c) are equally unconvincing. In its appeal brief, the IRS points to a Conference Report from the time of § 6111(c)'s enactment in 1984 which it argues demonstrates that the term "investment" was meant to include "plans or arrangements" like the Heritage Transactions. Doc. 7, IRS Br. 18–19. The Conference Report states the following:

> A tax shelter is required to be registered by the person having principal responsibility for organizing the tax shelter. In many cases, the tax shelter organizer will be the tax shelter promoter. The tax shelter organizer need not, however, be the promoter or general partner. For example, if a person structures or develops a series of related schemes from which he or a related party will benefit through service contracts or asset purchases, that person will be treated as the tax shelter organizer, even though each of the different arrangements is managed or promoted by a different individual.

H.R. Conf. Rep. No. 98-891, at 978 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1666. The IRS contends that the use of the word "arrangements" here in the Conference Report shows that the word "investment" in § 6111(c)(1) was intended to include "arrangements" like the Heritage Transactions. Doc. 7, IRS Br. 18–19. This paragraph, however, appears to address who may be considered a "tax shelter organizer" under § 6111(d)(1), not the definition of "investment" in § 6111(c)(1).[14]

The IRS also points to an example provided in the Conference Report for support. Doc. 7, IRS Br. 18–19. The example states:

> For purposes of this definition, similar investments organized by the same person are aggregated. For example, assume a sponsor of tax shelters develops generally similar investment plans or arrangements involving 8 different partnerships, each investing in a different item (such as a separate master recording or film), each with a different general partner, and each with 3 limited partners. If each partner invests $1,000 cash and $10,000 in nonrecourse obligations, there will be 32 investors (1 general partner plus 3 limited partners times 8 partnerships) and an aggregate investment of $352,000 (32 partners times $11,000). Thus, each partnership will constitute part of a substantial investment. If, in this example, representations are made that $1,000 in tax credits and $3,000 in deductions are available to each limited partner in the first year, the sponsor will be required to register all of the partnerships.

H.R. Conf. Rep. No. 98-891, at 979–80 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1667–68. The "definition" referenced in the first sentence is the definition of a "substantial investment," a term used in the paragraph of the Conference Report preceding the quoted material. *See id.* Thus, as with the previous reference, the language does not appear to interpret the definition of "investment" in § 6111(c)(1). Rather, in the latter case, it appears to address the aggregation of investments in partnerships for meeting the definition of a "substantial investment." Thus, the Court finds that the

---

[14]Section 6111(d)(1) of the statute as enacted in 1984, which defines "tax shelter organizer," was moved to § 6111(e)(1) in the applicable version. *Compare* 26 U.S.C. § 6111 (effective from July 18, 1984, to Aug. 4, 1997), *with* 26 U.S.C. § 6111 (effective from Aug. 5, 1997, to October 22, 2004).

few passages of legislative history referenced by the IRS fall short of the clear expression of congressional intent required to overcome the language of the statute itself. *Boureslan*, 857 F.2d at 1019.

Additionally, the IRS's argument that the bankruptcy court erred by narrowly construing § 6111 because it is not § 6111, but rather § 6707, that actually imposes the penalty is a nonstarter. These two provisions clearly function in tandem. Section 6111 imposes the registration requirement. Section 6707 imposes the penalty for failing to comply with § 6111's registration requirement. Any distinction between which is "penal" and which is "regulatory" is a distinction without a difference in this case. In any event, the Fifth Circuit recognizes the "longstanding canon of construction" that if "the words of a tax statute are doubtful, the doubt must be resolved against the government and in favor of the taxpayer." *United States v. Marshall*, 798 F3d 296, 318 (5th Cir. 2015); *see also United States v. Merriam*, 263 U.S. 179, 188 (1923). Here, the words of the statute are certainly doubtful, at least with regard to whether the word "investment" in a now-superseded statute was meant to encompass a financial arrangement that the IRS admits did not exist at the time the statute was drafted. *See* Doc. 7, IRS Br. 19–20 n.2. Thus, the Court agrees with the bankruptcy court that multiple canons of construction counsel against the Heritage Transactions being "investments."

Finally, the Court must address the IRS's complaint that the bankruptcy court "disregarded the IRS's interpretation of 'investment' in the Temporary Treasury Regulations." Doc. 7, IRS Br. 19. Specifically, the IRS argues the bankruptcy court erred by not giving *Chevron* deference to 26 C.F.R. § 301.6111-1T [hereinafter TR 301.6111-1T]. *Id.* at 19–24. This temporary Treasury regulation, arguably the only guiding authority on 26 U.S.C. § 6111, was promulgated in 1984 and, though titled

"temporary," has been in effect ever since.[15] *See* Lederman, Leandra, *The Fight Over "Fighting Regs" and Judicial Deference in Tax Litigation*, 92 B.U. L. Rev. 643, 662 (2012) ("Temporary regulations are similar to final regulations, but they typically are issued without prior notice and comment."); *see also* Wood, Eleanor D., *Rejecting Tax Exceptionalism: Bringing Temporary Treasury Regulations Back in Line with the APA*, 100 Minn. L. Rev. 839, 843 (2015) ("While temporary regulations issued today are binding on all taxpayers for no more than three years unless properly promulgated into final regulations, some grandfathered temporary regulations have arguably had the force of law for over twenty-five years.").

The temporary regulation actually takes the form of 60 hypothetical questions and answers dealing with various aspects of 26 U.S.C. § 6111. *See generally* TR 301.6111-1T. The IRS points to several sentences within one of the answers—Answer 22—which it argues constitute an official agency interpretation of the term "investment" in § 6111(c). Doc. 7, IRS Br. 19–24. Specifically, it highlights portions of Answer 22 stating that "[i]nvestments are considered similar if they involve similar principal business assets and similar plans or arrangements" and "[i]nvestments that include no business assets will be considered similar if they involve similar plans or arrangements." *Id.* at 19, 23. According to the IRS, it was authorized to issue such regulations under § 6111(f), which it claims "specifically authorizes the IRS to 'prescribe regulations which provide . . . rules for the aggregation of similar investments . . . .'" *Id.* (quoting 26 U.S.C. § 6111(f)(1)). What § 6111(f)(1) actually states is that the IRS may prescribe regulations which provide "rules for the aggregation of similar investments offered by the same person or persons *for the purposes of applying subsection (c)(4).*" 26

---

[15]Temporary Regulation 301.6111-1T was amended in 2008. For purposes of the Court's analysis, all references to TR 301.6111-1T are to the version in effect from 1984 to 2008.

U.S.C. § 6111(f)(1) (emphasis added). Section 6111(c)(4), as noted above, defines "substantial investment," as it is used in § 6111(c)(1)(B)(iii). *See* 26 U.S.C. § 6111(c)(4). So on its face, Answer 22 appears to have very little, if anything, to do with defining the term "investment" in § 6111(c)(1), and much more to do with explaining which investments may be aggregated for purposes of meeting the definition of a "substantial investment" in § 6111(c)(1)(B)(iii). This becomes even more clear when one reads the hypothetical question that Answer 22 answers: "Will an investment be considered a substantial investment if the investment involves a number of parts each including fewer than 5 investors or an aggregate amount of $250,000 or less?" TR 301.6111-1T, Q-22.

Before a regulation is entitled to *Chevron* deference, a court must first determine whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent of Congress." *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). If Congress has not directly addressed the precise question at issue, the court must decide "whether the agency's answer is based on a permissible construction of the statute." *Id.* (citing *Chevron*, 764 U.S. at 843).

The IRS argues that the bankruptcy court erred by holding that "any attempt to broaden [the definition of investment] through the Temporary Regulations[ ] . . . fails the first step of the *Chevron* analysis and is thus not worthy of deference." Doc. 7, IRS Br. 23 (citing Bankr. Op. 25 n.99). What the bankruptcy court actually held was that the legislature had clearly spoken as to the definition of a "tax shelter"—not an "investment"—and that, therefore, any attempt by the IRS to broaden the definition of a "tax shelter" failed the first step of *Chevron*. Bankr. Op. 25 n.99. Here, even assuming

the temporary regulation is entitled to *Chevron* deference,[16] the Court does not find TR 301.6111-1T all that helpful to the IRS's position.

As Canada notes in his Response, if any question and answer in the regulation is arguably relevant to the issue at hand, it would seem to be Question 4, which asks: "What investments are tax shelters that are required to be registered with the Internal Revenue Service?" TR 301.6111-1T, Q-4; Doc. 8, Canada Resp. 29–30. Notably, the answer to this question makes no mention of a "plan," "arrangement," or "transaction." TR 301.6111-1T, A-4. The Court also finds no language anywhere else in the regulation which would counsel a different result. Furthermore, as the bankruptcy court noted, none of the examples of "investments" mentioned throughout the regulation bear any resemblance to the Heritage Transactions. The IRS dismisses this point, stating that "those regulations were issued in 1984" and "[t]he tax-shelter industry has evolved significantly since then." Doc. 7, IRS Br. 19–20 n.2. But if anything, this only strengthens Canada's argument that the law and its corresponding regulation were not designed to capture arrangements like the Heritage Transactions.[17]

In conclusion, the plain meaning of the word "investment" simply does not appear to encompass the Heritage Transactions. Nor do the usual canons of statutory construction or the legislative history, or even the IRS's own temporary regulation, indicate that Congress intended

---

[16]The Fifth Circuit has expressed hesitancy at the thought of affording *Chevron* deference to a temporary Treasury regulation issued without pre-promulgation notice and comment. *See Burks v. United States*, 633 F.3d 347, 360 n.9 (5th Cir. 2011)

[17]Also persuasive to the Court, though only briefly mentioned by the bankruptcy court, was the testimony before the bankruptcy court regarding the almost total incongruence between the Heritage Transactions and the IRS form used to register tax shelters under the applicable version of § 6111. R. 221–26, 551–52.

otherwise here. Therefore, for the reasons stated above, the determination of the bankruptcy court that the Heritage Transactions were not "tax shelters" subject to registration because they were not "investments" is **AFFIRMED**.

B.  *If the Heritage Transactions Were "Investments," Whether Canada Established "Reasonable Cause" for Failing to Register Them*

Though the finding above that the Heritage Transactions were not "investments" under §6111 is technically dispositive, the Court next reviews the IRS's complaint regarding the bankruptcy court's determination that—assuming the Transactions *were* "investments"—Canada had "reasonable cause" for failing to register them. As noted above, § 6707 provides the penalty for failing to register a tax shelter under § 6111. 26 U.S.C. § 6707(a)(1). Section 6707 also provides, however, that "[n]o penalty shall be imposed . . . with respect to any failure which is due to reasonable cause." *Id.*

The bankruptcy court concluded that "Canada made a reasonable, good faith effort to comply with the law by analyzing the statute on his own" and that "[i]t was entirely reasonable for an experienced lawyer such as Canada to rely on his own expertise in the law and his own understanding of the Heritage Transactions in order to conclude that he did not need to register the Heritage Transactions as tax shelters." Bankr. Op. 36–37. On appeal, the IRS contends the bankruptcy court erred in holding that Canada established "reasonable cause" because "Canada had a vested interest in concluding that Section 6111 did not apply to the Heritage Transactions" and "because he had little, or no, federal tax experience, it was unreasonable for him not to seek advice from either the Service or a disinterested third party." Doc. 7, IRS Br. 11–12. Before addressing the merits of the IRS's argument, however, the Court must first address the standard of review.

Interrelated with the standard of review question is Canada's motion to strike a portion of the IRS's Reply Brief. Both are addressed below.

To begin, the parties disagree on the appropriate standard of review for the bankruptcy court's "reasonable cause" determination. The IRS contends that the *de novo* standard should apply because the underlying facts are virtually undisputed and therefore, it argues, the Court need only apply the law to the undisputed facts. Doc. 10, IRS Reply 3. Alternatively, the IRS argues this is a mixed question of law and fact, which is also subject to *de novo* review. Doc. 7, IRS Br. 3. In its Reply Brief, the IRS also appears to argue that Canada cannot establish "reasonable cause" as a matter of law because he never inquired as to whether the Heritage Transactions were registered, and then upon discovering that they were not, he did not register them himself as soon as possible. Doc. 10, IRS Reply 13–14. Canada, on the other hand, argues that the "reasonable cause" finding of the bankruptcy court is a factual finding subject to the clear error standard of review, which is highly deferential to the bankruptcy court. Doc. 8, Canada Resp. 15. While the Court agrees with Canada, it would affirm the bankruptcy court's "reasonable cause" finding under either standard, and so will perform a *de novo* review to demonstrate.

First, regarding the standard of review, the presence or absence of reasonable cause is generally a fact question. *See United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985) ("Whether the elements that constitute 'reasonable cause' are *present* in a given situation is a question of fact, but what elements *must* be present to constitute 'reasonable cause' is a question of law.") (emphasis in original); *see also Whitehouse Hotel Ltd. P'ship v. Comm'r of Internal Revenue*, 615 F.3d 321, 341 (5th Cir. 2010) ("reviewed for clear error is the tax court's determination of whether the elements that constitute 'reasonable cause' were proven" in cases of accuracy-related civil tax penalties). The IRS's

own temporary Treasury regulation interpreting § 6707 explicitly states that "[i]n general, the determination of whether reasonable cause exists for failure to register a tax shelter is a *question of fact.*" 26 C.F.R. § 301.6707-1T, A-4 (emphasis added). Likewise, another IRS regulation interpreting the "reasonable cause" defense to an accuracy-related penalty under 26 U.S.C. § 6662 indicates that "[t]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6664-4(b)(1). Thus, the Court finds that the clear error standard also applies here—even though the underlying facts are undisputed—because the bankruptcy court's "reasonable cause" determination was a factual inference made from the undisputed basic facts. *See Chared Corp. v. United States*, 446 F.2d 745, 746 (5th Cir. 1971).

Second, in his motion to strike, Canada contends that the IRS has raised a new "reasonable cause" argument which was not before the bankruptcy court. According to Canada, the IRS now argues that Canada cannot establish "reasonable cause" as a matter of law because he did not inquire as to whether the Heritage Transactions were registered and then immediately register them himself upon learning they were not. Doc. 11, Mot. to Strike 3–7. Canada contends that this argument was not before the bankruptcy court, and that even if it were, the IRS failed to raise it before this Court until its Reply Brief. *Id.* at 6. In response, the IRS argues that this argument was, in fact, raised in the bankruptcy court and asks the Court to take judicial notice of its trial brief raising it there. Doc. 13, IRS Resp. to Mot. to Strike 3.

The IRS's trial brief, which the IRS admits cited the incorrect regulation for the proposition, does appear to make the argument that "reasonable cause" is limited to a seller who registers the tax

shelter as soon as practicable after learning that it has not been registered. *Id.*[18] The argument was not, however, raised in the IRS's initial appeal brief to the Court, and the IRS does not provide any explanation for its failure to raise the argument in this Court prior to its Reply Brief. Generally, a court will not consider arguments raised for the first time in a reply brief. *Penn. Gen. Ins. Co. v. Story*, No. Civ.A.3:03CV0330-G, 2003 WL 21435511, at *1 (N.D. Tex. June 10, 2003). However, "no 'palpable injustice' exists where the nonmovants are given a chance to respond." *Id.* In this case, Canada had the opportunity to respond to the argument in his cross-appeal response, which essentially functioned as a sur-reply. Doc. 12, Canada's Sur-Reply. Therefore, Canada's Motion to Strike this argument from the IRS's Reply Brief is **DENIED**.[19]

Turning now to the merits, the Court again notes the total lack of case authority interpreting the applicable provisions of §§ 6707 and 6111. Not only are there no existing cases to guide the

---

[18]The IRS takes this argument from 26 C.F.R. § 301.6707-1T, A-6 (though it incorrectly cited "Treas. Reg. § 301.6111-1T (Answer 6)" in its trial brief to the bankruptcy court). In its entirety, the Answer states the following:

> A-6: Reasonable cause for failure to register a tax shelter will generally exist with respect to a seller who is required to register the tax shelter under A-36 or A-39 of § 301.6111-1T, if the seller registers the tax shelter as soon as practicable after the seller first knows or has reason to know that the tax shelter has not been timely registered. A seller will not have reasonable cause, however, if the seller fails to make a reasonable inquiry to determine whether the tax shelter is registered.

[19]To the extent the IRS relies on this argument, however, the Court finds it simply makes no sense. The argument would be that as a matter of law the only way Canada could establish "reasonable cause" under § 6707 for his "failure" to register the Heritage Transactions would be by having registered them as soon as possible after finding out they weren't already registered. In essence, the IRS would be arguing that the only way to establish an excuse for not registering something would be by registering it, which would effectively convert the "failure to register" defense to merely a defense for late registrations. Furthermore, any distinction between Canada's investigation of § 6111's registration requirement and an "inquiry to determine whether the tax shelter is registered" is tenuous at best. For these reasons, and because the Court has already determined that the clear error standard of review applies to the bankruptcy court's "reasonable cause" finding, the Court is not persuaded by the IRS's "new" argument that Canada cannot establish "reasonable cause" as a matter of law because he did not make "reasonable inquiry to determine whether the tax shelter [was] registered." *See* 26 C.F.R. § 301.6707-1T, A-6.

Court now, but—arguably more important to the "reasonable cause" analysis—there would have been none for Canada to consult at the time. Therefore, the only guidance, if it can be considered guidance, available to Canada on the interpretation of § 6111's registration requirement would have been 26 C.F.R. § 301.6111-1T, the temporary Treasury regulation discussed above.

The testimony before the bankruptcy court was that Canada consulted only the statute itself—26 U.S.C. § 6111—and its corresponding regulation—26 C.F.R. § 301.6111-1T—in determining whether the Heritage Transactions fit within § 6111's registration requirement. R. 160–65. After reviewing these and coming to the conclusion that § 6111 did not apply, Canada was confirmed in his belief by Ed Ahrens, the attorney who initially conceived of the Heritage Transactions. *Id.* As the bankruptcy court correctly noted, however, Canada could not rely on the professional advice of Ahrens because Ahrens was financially involved in the Heritage Transactions. Bankr. Op. 28–34. Therefore, Canada must establish "reasonable cause" based solely on his own investigation of § 6111 and its corresponding regulation. The IRS argues Canada cannot establish "reasonable cause" because he suffered from the same conflicts of interest as Ahrens and, therefore, should have consulted an independent third-party. Doc. 7, IRS Br. 11–12.

"Reasonable cause" is not defined in the statute. *See* 26 U.S.C. § 6707. And the corresponding regulation provides little guidance other than that a seller must "make a reasonable inquiry to determine whether the tax shelter is registered" and register it "as soon as practicable after the seller first knows or has reason to know that the tax shelter has not been timely registered." 26 C.F.R. § 301.6707-1T, A-6. This, of course, assumes that the arrangement is in fact a "tax shelter" and that the person claiming the "reasonable cause" defense is one "who is required to register the tax shelter" under § 6111. *Id.* Otherwise, all that the regulation provides regarding what constitutes

"reasonable cause" is that it is generally a "question of fact." 26 C.F.R. § 301.6707-1T, A-4.

By analogy, courts analyzing a "reasonable cause" defense to tax penalties under other tax statutes have found that reliance on the advice of a tax professional may constitute "reasonable cause." *See, e.g.*, *Thomas v. Comm'r of Internal Revenue*, No. 22909-10, 2013 WL 690599, at *3 (T.C. Feb. 26, 2013) (addressing the "reasonable cause" defense to enforcement of accuracy-related penalties under 26 U.S.C. § 1.6664-4(b)(1)). Such reliance, however, may "be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about." *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*, 115 T.C. 43, 98 (2000). Here, the IRS argues that because consumers could not have reasonably relied upon Canada's advice—due to his own financial interest in the Heritage Transactions—he likewise could not have relied upon his own independent analysis of the registration requirement. Doc. 7, IRS Br. 27. The Court, however, disagrees.

First, legal "reliance"—as in "reliance on the advice of a tax professional"—is not the same as Canada's "reliance" on his own investigation of his registration responsibilities. For example, Canada could not sue himself for his own bad advice, not to mention the fact that Canada is not a "tax professional" in the first place. And second, the Court agrees with the bankruptcy court that such reliance on a tax professional is but one way of demonstrating "reasonable cause." Again analogizing to cases analyzing other "reasonable cause" defenses in the tax code, the Fifth Circuit has stated that "reasonable cause" determinations are "made on a case-by case basis, taking into account all pertinent facts and circumstances" and that "[t]he most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances." *Brinkley v. Comm'r of Internal Revenue*, 808 F.3d 657, 668–69 (5th Cir. 2015) (addressing 26 U.S.C. § 1.6664-4(b)(1) and

citing *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 548 (5th Cir. 2009)).

Here, although Canada was not a tax attorney and had admittedly "very little" pure tax experience before joining the Heritage Organization, he was still a Harvard-trained lawyer with over 15 years of experience in commercial litigation, not to mention several years working in estate-planning-based insurance products while at Heritage. He read virtually the only authority in existence at the time—the statute and its corresponding regulation—and determined that they did not apply, a conclusion which both the bankruptcy court and this Court have also come to. The IRS laments that Canada consulted *only* these authorities in assessing his responsibilities, but they appear to be the *only* authorities that were available. Additionally, Canada testified that nothing in his duties at Heritage, which included reading daily tax publications and interacting with Heritage's clients' personal financial advisors regarding the Heritage Transactions, convinced him otherwise. R. 438–40.[20]

It is "inappropriate to penalize taxpayers where a mistake of law was in a complicated subject

---

[20]The IRS argues that Canada stipulated that the only thing he relied on for confirmation of his conclusion that § 6111 did not apply was the biased opinion of Ed Ahrens. Doc. 10, IRS Reply 13. However, the testimony before the bankruptcy court that the IRS refers to actually states the following:

> THE COURT: Mr. Lewis, the only authority that Mr. Canada *was directed to by Ed Ahrens* was the statute itself, 26 USC 6111 and the associated regulation. And is that what Mr. Canada so stipulates?
> MR. LEWIS [CANADA'S ATTORNEY]: That's what he so stipulates.
> THE COURT: Mr. Canada?
> MR. CANADA: Yes, Your Honor, I agree.
> THE COURT: Mr. Herrin, we down with that?
> MR. HERRIN [IRS'S ATTORNEY]: Your Honor, I think we have to be down with that.

R. 164–65 (emphasis added). Thus, Canada did not stipulate that once he made his determination, he never thought about § 6111 again. Instead, he stipulated only as to what authorities Ed Ahrens referred him to.

area without clear guidance." *Shao v. Comm'r of Internal Revenue*, No. 12697-05, 2010 WL 3377501, at *6 (T.C. Aug. 26, 2010). And the United States Tax Court has recognized "honest mistakes of law" where "the law was unclear, the taxpayer made a reasonable good-faith effort to comply with the law, and under all the facts and circumstances it would have been unfair to penalize the taxpayer for an honest mistake. *Ochsner v. Comm'r of Internal Revenue*, No. 20560-07, 2010 WL 2220305, at *8 (T.C. June 3, 2010). This is even more so the case when the issue is one of first impression, as this case appears to be. *See Williams v. Comm'r of Internal Revenue*, 123 T.C. 144, 153–54 (2004) (holding that the taxpayer was not liable for accuracy-related tax penalties under 26 U.S.C. § 6662(a) where the case was one of first impression, there was no clear authority to guide the taxpayer, the IRS did not point to any cases that had previously answered the specific question at issue, and the position the taxpayer took was reasonably debatable).

In all, considering the specific facts and circumstances of the case, and given the complexity of the statutes in question, the lack of—and lack of clarity in the existing—authority, and Canada's own investigation into his registration responsibilities, the Court agrees with the bankruptcy court that it would be unfair to penalize Canada for what appears to have been an honest mistake of law based on his reasonable, good faith effort to comply. Therefore, the bankruptcy court did not err, and certainly not clearly so, in finding that Canada established "reasonable cause" under 26 U.S.C. § 6707(a) for failing to register the Heritage Transactions as tax shelters. For these reasons, the ruling of the bankruptcy court is **AFFIRMED**.

IV.

CONCLUSION

For the reasons stated above, the Court **AFFIRMS** the bankruptcy court's order sustaining Canada's objection to, and disallowing the IRS's claim for, civil penalties for failing to register the Heritage Transactions as tax shelters. Additionally, as noted above, Canada's motion to strike is **DENIED**. Because the Court AFFIRMS the bankruptcy court, it does not reach Canada's provisional cross-appeal. Accordingly, this appeal is hereby **DISMISSED**.

SO ORDERED.

SIGNED: May 8, 2017.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE